The next case today is SAS International v. General Star Indemnity Company, Appeal No. 21-1219. Attorney Renner, please introduce yourself for the record and proceed with your argument. Good morning, Your Honors. Eric Renner on behalf of the Plaintiff Appellant SAS International. Your Honors, SAS submits that it has stated a plausible claim for purposes of defeating a Rule 12b6 motion to dismiss. Specifically, SAS alleged plausibly that it suffered loss or damage to property within the scope of coverage of the insurance policy. The policy here is what's called an all risks policy, meaning it broadly ensures against all risks of loss or damage to property unless specifically excluded by the policy. The operative words here are direct physical loss of or damage to property. SAS alleges that it satisfies that coverage trigger. Notably, the terms physical loss of and or physical damage to loss and damage are separated by the disjunctive or, meaning that either loss or damage are sufficient to trigger coverage. And here SAS alleges both, both loss of property and damage to property. First, SAS suffered direct physical damage to property during the policy period. Its property suffered a physical alteration that adversely affected the functionality or use because COVID-19 and the SARS-CoV-2 physically altered the composition of the air to contain infectious particles. And two, physically attached to and resided on surfaces of objects at the property. Second, SAS also suffered, alleges that it suffered physical loss of property during the policy period. COVID, by its actual presence both in the air and on surfaces, caused SAS's property to become physically unfit for human habitation and physically unusable for its intended purpose. Critically, unlike a lot of other of these COVID insurance cases, SAS specifically alleges that COVID, the virus, was actually present on its property during the policy period. Also critically, the policy here does not contain a virus exclusion. SAS, in its complaint, alleges that individuals infected with or and or suspected to be infected with COVID were actually present on its property during the policy period, thereby depositing COVID at the insured location. Additionally, because of the prevalence of COVID in the community, based on the science which continues to emerge, a substantial number of individuals necessarily were sick and shedding the virus and present at the property. Can I ask you about the loss theory? Sure. So I'm just trying to figure out how the loss theory works, because if I'm understanding it, the theory that makes the most sense to me, but I'm not sure if this is your version of it, is that you had to close down because of the risk that COVID would be present. Well, that is true, but it's also true that we allege that COVID, not just the risk of it, but the actual presence of COVID. And why would the actual presence support the loss theory that you're running? Because of the actual presence of COVID and because of the risk of additional spreading of COVID. It's the second thing you just said. The second thing is not the first. The second thing is not about the presence. So I'm trying to figure out for the loss theory, doesn't that depend on the risk of the presence much more than the presence? Well, the loss is that the actual presence of COVID and the risk of additional spreading of COVID. What's the evidence in the complaint? I'm just not quite following how there's a closure because of the presence. I can understand how there's a closure because of the risk of the presence, and the ubiquity of it in the community means that you contend a risk that if you're open, it'll be there. But I'm not understanding what the theory is about closure based on the presence, given how transient the virus is and given how little knowledge we have about at any particular moment, we know it's there. Sure. So I'll try my best to respond to your question. The duration of the presence of the virus once it was closed. Sure, Your Honor. I think it's important to see procedurally where this case is or was at the lower court, which was a motion to dismiss. And so really what the question is, did we plausibly... Four minutes remaining. Four minutes. ...plausibly suggesting or plausibly making out a cause of action that there's coverage under the policy. So admittedly, the complaint does not contain all of the factual evidence or expert evidence that would ordinarily be included, for example, on a motion for summary judgment or at trial. But I don't think that on a motion to dismiss, that's the standard. And so that's kind of one of the big – it's kind of the overarching... Did you allege that there was a risk of loss because of the risk of the presence of COVID in your complaint? We do allege that, yes. Okay. So with respect to that, to see if that's a viable theory, let me just give you a hypothetical and you tell me if this makes out a claim. I have carbon monoxide detectors in my restaurant. They go off. So I clear the restaurant because there's clearly a risk of carbon monoxide exposure. Turns out the carbon monoxide detectors were defective. So I can't prove that there really is any carbon monoxide. So I cleared everything up because of a risk of it, because I was worried about it. The worry turned out to be traceable to this defective detector. Is that covered by the policy? If there never was carbon monoxide to begin with? Yep. But you thought that there was. I'm not sure that would... Okay. That's not what we're alleging. We're alleging that there was carbon monoxide. What? Based on your hypothetical, I would be alleging that there actually was carbon monoxide. No, but I'm just trying to deal with your risk claim. Your risk claim is not based on presence of the virus. It's based on a theory that there will be present virus. So I want you to just explain, how is your case different than my carbon monoxide example? Well, I just want to make sure that I'm conveying clearly that we do allege both risks. I know you do. I'm not asking about that. I got it. Fair enough. I just wanted to make sure. Yeah, I appreciate that. Well, so science, the scientific studies, which are evolving, right, we're in a much different place today than we were back in March of 2020. But what we seem to know now is that basically COVID or COV2 is ubiquitous. So it's different than carbon monoxide. Carbon monoxide isn't kind of prevalent throughout the community. So the scientific studies… Mr. Renner, I would have thought the answer was there is no detector to tell you that COVID was not present in your premises. The risk was there, and there is no mechanism to determine that the risk was not there, unlike the carbon monoxide detector. That's an excellent point, and I wish that I had made that myself. But yes, I'll adopt that answer. I'm not taking any position here. I'm just trying to sharpen the inquiry. Yes. So to just play that out, you'd say if somebody had come around a restaurant and said, you know, a health and safety inspector, and said, look, I'm pretty convinced you have a radon leak or carbon monoxide leak. You've got to stay out of here. I don't have a detector with me that can pick it up right now, but it's not safe to go in there for 48 hours. You would say that if the evidence backed up that there really was really good reason to believe that there was radon or carbon monoxide there, the policy covers the closure, even if it's never proved that there was carbon monoxide or radon in the premises. Is that right? I would say that, yes, Your Honor. Okay. Do you have any case that tells me that you're right to say that? Under Massachusetts law? Under Massachusetts law, no, nothing comes to mind where it's kind of a false claim. Is there any case in any state in the United States that addresses that question about the risk point? The risk of exposure to a deadly, you know, non-material gas or something like that? There's the Oregon Shakespeare Festival case, which maybe not exactly on point. Go ahead, please. Which maybe not exactly on point. The trigger for coverage there was the threat of smoke coming into the insured property. Even though it never actually materialized, there was a threat. There was wildfires, and there was a threat of smoke. So, I would point, Your Honor, to the Oregon Shakespeare Festival case. Okay, that's helpful. Thank you. Okay. Thank you, Mr. Ratner. Thank you. Do you have anything to say about the order that we issued, just whether we should be deciding this case while the SJC issue is pending? I can talk about that. I had talked to Mr. Gilbert. He might have more elaboration on the Vervine and the legal seafoods case, but what I'll say briefly is that I would – my case is analogous to legal seafoods. We both make similar, if not the same, allegations. The Vervine case, which I believe is scheduled for oral argument beginning of January with the SJC, but that case is distinguishable from this case and from the legal seafoods case in a couple critical ways. One, as the court in that case in the decision noted, that the plaintiff, Vervine, didn't allege the actual presence of COVID like we do here. So that is something that distinguishes the allegations in this case versus the Vervine case. And then secondly, I would say that the court there, I would take issue with the way it analyzed and ruled on the loss of use trigger for coverage. In that case, the judge basically says there has to be some sort of physical alteration or physical damage to the property, and I disagree with that. I think the case law over decades and decades is pretty clear, and especially in Massachusetts, that loss and damage are not the same, and you can have loss even if there is no tangible or physical alteration of the property. So that's a distinction between Vervine – well, maybe not a distinction, but just an error I guess that I would take issue with. Okay. At this time, Attorney Renner, please mute your audio and video. Attorney Gilbert, please unmute your audio and video and introduce yourself for the record and proceed with your argument. May it please the court, my name is Robert Gilbert. I am appearing on behalf of Amica Curie, Lawrence General Hospital, and Amphenol Corporation. As a friend of the court, representing two quite different and yet quite typical policyholders, I begin with, I think, two simple facts, and then I make two straightforward requests for the court to consider. First, the modest facts are that not all policies are written the same or created equally, and the second is that not all policyholders are similarly situated. The request that we make as friends of the court is we ask the First Circuit to proceed slowly on the facts in front of them, avoiding rulings that do not account for the vast variations in policy language and the situation of different policyholders. And the second is a bit more aggressive, but we think very, very important, and I can go into the reason why we make this request. We ask that the First Circuit allow our courts and require our district judges to follow time-tested standards of pleading, discovery, and proof when dealing with Rule 12b6 and Rule 12c motions. And the reason that we do this, I'd like to get, we make this request, I'd like to get into, and I think this dovetails pretty well with the court's order immediately before oral argument to discuss the differences and similarities with Vervine and legal seafood. As a rule, in the, across the country, especially in the federal courts, district court judges have been applying unprecedented scrutiny to plaintiff's complaints. In this case, SAS specifically alleges direct physical loss and damage to its property. With respect to the damage prompt, they are very, very clear that the virus was present on their property, that it didn't just idly sit there until it magically and quickly disappeared, but that it actually attached to the surface of property and that it hung in the air. In any other context, these would be deemed sufficient to allege, to the extent it's required, actual structural alteration of property. Now, I footnote that point about actual structural alteration because couch has been cited repeatedly by courts. Couch is mistaken when it says that that's a requirement, and there is a recent article from the Tort and Lodge. I think what confuses me is I understand the theory of recovery for the claim when it's a risk of loss. There was a risk of COVID being present such that we had to shut down the premises. I maybe can understand an argument about cleaning costs and the like for the attachment to surfaces, but I guess I'm just having trouble going from the fact that there's an allegation that the virus was present without any specification of how long and what quantity to any recoverable claim. I just don't quite follow that. If the virus is actually present, there, of course, would be cleaning costs and so forth. The premises are physically dangerous and unfit for human habitation. But I don't understand. That's true for how long a period of time after it's first detected? That is a uniquely factual question, and the circumstances were very dramatic. You don't have to make any allegation regarding that. Just to take an example, suppose you brought your claim here based on influenza. You shut it down because influenza was present. Would that be an actionable claim also? That I don't know. I would say influenza is present. You're saying on 12B6, we have to take that as true. It altered the structure, had to be cleaned, can't do anything more. You've got to wait for discovery, so the claim goes forward. Is that your position? And if not, why is this different? If there is an allegation that this particular strand of influenza rendered the property unreasonably dangerous and unfit… Suppose there is that allegation. In that case, they would be entitled to make their showing. But that's just a legal conclusion that it rendered it unreasonably dangerous, isn't it? That's not a fact. Well, it's a mixed question of fact and law. Under ICPOL, we don't just defer to that. That's just stating the outcome. My problem with the presence of the virus alone is without any more factual detail other than it was there for a second. I don't really understand why that's actually recoverable under the policy. But I understand the risk point. The risk point, I can see it more easily, assuming the case law supports that. And I would like to address the risk point and the loss issue. Mr. Renner referenced the Oregon Shakespeare Festival case involving smoke from wildfires. There are two things going on in the Oregon Shakespeare Festival case. The first was ash would be deposited, and that was easily cleaned off of the seeds. The bigger problem was the fact that smoke would blow in or blow out depending on the way that the winds were shifting. And it was therefore impossible for the Oregon Shakespeare Festival to go forward and exploit their property. They had to close their property because it was unreasonably dangerous. The smoke was not there 100% of the time, but the smoke would blow in, the smoke would blow out. It was in some ways more ephemeral than the SARS-CoV-2 virus. Four minutes remaining. We set forth in our expert report from an eminent MIT scholar of viruses. The virus is not ephemeral. It does not easily dissipate. It is not easily cleaned. These are intensely factual questions. One of the difficulties that we have had with respect to the way that district courts have been treating this, including the court below in this case in legal seafood, are factual findings that have no support in the complaint. Mr. Gilbert, that line of argument runs into the fact that under Massachusetts law, insurance law, basic contract interpretations are issues of law for the court. I don't want to dwell on that. Let's go back. We were told you were going to be the one to address the questions. We put in our order that we wanted counsel to respond to on the effect of the SJC case and on the effect of legal seafoods. Before you get into that, the way I understood your fellow counsel was he said, oh, and there is an overlapping issue because the judge in the SJC case made an error of law in thinking that loss and physical damage were the same concept. If that is so, that kind of suggests that we ought to wait for the SJC, even though it may be distinguishable on other points. Now I have set it up for you. What is your answer? Our answer to that is that the Verveen case that is going in front of the SJC in early January differs materially and we suspect that that will not be an effective vehicle for answering some of the more difficult questions that are presented with more robust factual pleading. In SAS and in legal seafood, there were allegations of actual onsite virus. In Verveen, two of the three policies had no virus exclusion. We suspect that this was one category of case that tried to plead around the virus exclusion by saying we are claiming that there is an order out there that keeps us from using our property without tying the order to something physical involving a virus. For that reason, it falls into the vast majority of cases that have foundered in the state and federal courts that involve virus exclusions or attempts to plead around virus exclusions by artfully saying this is not about a virus. This is not about physical harm inflicted by the virus. One of the Verveen policies did not have a virus exclusion? Two of the three did not. Did not? And the third did. So do we know what, do you have anything to tell us about whether the ones that had no virus exclusion, you wouldn't need to plead around it by just arguing about the civil order. In those, is there any claims that resemble yours? It sounds like there was because your co-counsel was telling us that the court erred in addressing one of them by dealing with the loss or damage claim. Why would they have reached that if the only thing that arose was what you're talking about? My take on Verveen is a little bit different, which is that the error that Judge Sanders made to the extent that she did was in, we think she did effectively complain loss and damage and did not give a full discussion of what sort of claims to constitute a direct physical loss of property as opposed to direct physical damage to property. Isn't that the same issue here? Is that one of the issues here? We think that SAS, perhaps not in as great detail as subsequent complaints that have come along, but SAS did make out a valid case for loss of property because they did allege that the virus was present in the community and that they were unable to physically use their property. If Verveen construes what loss means at all in this context, it might well bear on your claim. That's all we're asking. I guess I'm hearing you say, although you don't seem to want to say it, that it might. Well, it very well could. I can't predict what issues the SJC will find interesting. Neither can we. I have another question. You made the point that different policyholders are differently situated, and you represent a hospital. So I can see that hospitals, who by their nature have to treat sick people, have to treat anyone who walks in, might have a stronger claim of risk than perhaps some others. But the distinction between hospitals and restaurants isn't other than degree of risk. So evident to me, restaurants don't control who comes in. They don't control who's going to spread fomites, and there's no way that they could set criteria to do that. So I don't understand your different policyholders. I don't understand what you're getting at when you make that argument. What I'm getting at, Your Honor, is that there will be different levels of exposure to COVID and to the SARS-CoV-2 virus, depending not only on the type of business, but the particulars of a business. So, for instance, a business that's deemed essential in order to stay open and has people who are coming on the property who are highly presumptive or actually proven to have COVID-19 could inflict property damage through the spreading of the virus in a way that a business that cannot open because of an order. Businesses that are ordered to stay closed because the prevalence of the SARS-CoV-2 virus that could blow in if they remain open, they are differently situated than essential businesses. Factories are differently situated than hospitals. OK. But my question is, where does that lead you? Are you saying there should be different pleading requirements based on what industries are involved, whether they're essential, whether they're subject to a closing order or not? I mean, it's a little difficult for courts to adopt per se rules like that. We are not suggesting that the First Circuit adopt per se rules. In fact, it is just the opposite. We are suggesting that if the court finds it is necessary to plead structural alteration, that they evaluate each complaint that comes before them. What we are also suggesting is that they make it clear to courts that they should not be entering fact findings like what Judge Stearns did in the SAS case where he stated... In my case, we don't issue advisory opinions and we don't make any assumptions that our federal district judges are not complying with the requirements of Rule 12. Do you have anything else to say? I could go on for hours. I have one last question for you. I'm trying to understand how to think about the claim and why there's a dispute in court. Presumably you want money, right? Yes. Okay. So, in the case in which you are forced to stay open, like a hospital, you don't have the option of closing. The money, I guess I understand, the money would be that the policy, the insurer has to cover the cost of what? Repair and recovery? Is that what the phrase is? Cost of repair, extra expense incurred in order to remain opening and functional. So, that would include the cost of testing protocols, PPE, all of that kind of stuff? We would maintain that it does. I suspect we would have arguments at every juncture from insurers, but yes, that general category. But in terms of the disputed points before us, the question of whether, even if you're right that there was a structural alteration, the question of whether anything follows from that that would enable you to recover on the policy, that's not in dispute in these fields? Because there's been a finding that there was an insufficient allegation that the property had even been physically affected, the subsequent questions of for what duration... So, for purposes of appeals before us, the idea would be we are just to assume that if there was a structural alteration of any kind, questions then about whether that structural alteration could lead to an actual claim under the policy for repair. Are just a separate issue altogether. This is just a gating question. It is a gating question, Your Honor. I see. Okay. Okay. Thank you. Thank you. At this time, Mr. Gilbert, please mute your audio and your video. And Mr. Eggert, please unmute your audio and video and introduce yourself on the record to begin your argument. Good morning, Your Honors. May it please the court, my name is Ben Eggert, and I'm appearing on behalf of Appley General Star Indemnity Company. There are three points that I wanted to stress in the argument today. I'll tick them off quickly. One is I want to address the court's order about the inquiry about the overlap between this case, legal seafood, and Vervine. Second point is I'd like to talk about the well-settled Massachusetts law that really informs the background of this. And then the third point I want to address with the court is the actual allegations that are in SAS's complaint and what we can do with them and what we can't do with them. To the first point on legal seafood and Vervine, on legal seafood, I agree with counsel for SAS that while there are some distinctions between this case and legal seafood, they are relatively minor, and I can get to them in a little bit to illuminate it when I get to talking about the complaint itself. But in terms of the legal issues presented to the court in both of these cases, they are basically more or less the same. With Vervine, which is pending before the SJC, I don't think there's any reason for the court to hesitate to rule on this and waiting for that case. I mean, to be sure, they are coming up in the same context. There is some overlap on what's before the court. If there were a Venn diagram, it wouldn't match up perfectly because there's different coverage provisions that are there. But the core of it, the core language is the same. Some of the core Massachusetts law principles are the same. But the context that Vervine was ruling on was against the background of pre-pandemic case law and how Massachusetts courts apply those seven magic words of direct physical loss of property. Mr. Eggert, I'm sorry. I simply don't understand. Insurance law, all of the questions we have are state law matters. They're not federal law matters. We look to what the SJC has to say. We can't guarantee the SJC is going to answer all of the questions here. But if we were to disagree with the SJC on some of the overlapping questions, it doesn't matter what we think. It only matters what the SJC says Massachusetts law says. So unless you're going to argue that these cases can be decided on independent grounds, on issues that do not appear before the SJC, if that's what you're arguing, I'd like to hear what that is. And then secondly, sometimes courts say helpful things about the state of state law that the federal courts then listen to. So even if the issues could be segregated out, we then have the other question of, well, should we wait? Because they're likely to say something that will help us. So could you address that, please? Yes, Your Honor. And I didn't mean to suggest that this court would ever ignore what the SJC would say. We know that, counsel. Just get to it. My point that I was trying to get to was that the background law that the SJC is looking at, they're basically parallel cases, is the same case law that has been applied both in Massachusetts state courts before the Verveen case and has been applied by Massachusetts federal courts in other cases. So I guess the thought of that is therefore we can pretty much guess what the SJC is going to do before the SJC does it. Is that the idea? That's it. But that seems a little bit cheeky on our part if the SJC is about to relieve us of the need to guess because they're going to answer the case. Why guess when we know exactly what the answer will be to whatever they say? Well, I understand from a pragmatic standpoint what's animating both of these lines of questions and I'm not trying to dissuade you. And anyway, the fact that the cases that are on appeal have been decided looking backward at precedent doesn't tell us anything about what this SJC will do in this particular context. So yeah, even your argument that, gosh, we should take a backward look and that will solve all of the problems doesn't work. I understand what you're saying, Your Honor. And then the other point that I wanted to make, again, on top of the background law, is the distinctions between the factual allegations which are here and really show how the amendment complaint that's filed by SAS is insufficient in multiple respects and the district court was appropriately… More so than the complaint filed in Verveen? I think so based on what the legal issues that SAS is now focused on because in Verveen they're really focused on is a closure order, can that lead to direct physical loss? And SAS, both in its oral argument and in its pleadings, is basically saying we're different from those kinds of cases. What has now percolated up from what they originally alleged and what's been the focus of their argument or briefing at the district court and is very clear now what's before this court is they're saying the alleged presence of the… But I thought their other argument was that there is a risk of the virus being present there that required the closure. So you read them… I guess I'm not following the loss. I thought their argument about loss is really only intelligible if they're talking about the risk as opposed to the damage. Well, I agree it's not necessarily intelligible, but I think the clear focus of their argument in the briefing and oral argument is really about the presence, not the risk. And I understand that there's some policy about that. Just on the presence, are you saying that the question of presence alone is not presented in Verveen? Correct. By any of the complaints? Correct. Okay. As far as I'm aware, I… That's helpful if so. And then on the presence question, what do you make of the last counsel's contention that since this is a gating inquiry about presence, the right way to think about it is simply is it present and have they sufficiently alleged its presence? If they have, then that aspect of the claim is satisfied. And then whatever follows from that, such as is it within the policy to understand that the mere presence alone would suffice to support recovery for all the cleaning that occurred, much of it which was preventive, no doubt. That that's the right way to think about the claim rather than say you haven't even satisfied the structural alteration by making the allegations you did make about the presence of the virus. I understand why you're raising the question and why the amici hospital is going in that direction. But turning to what's here is there's just threadbare allegations of presence. And so what the actual dispute that's before the court on this… How would you prove presence? What should they have alleged that they did? They said it was present. They explained why it would be plausible to think it was present. They speculate as to it. I mean, they have a general allegations about the mechanisms of transmission of COVID. And then they say… What else would you have them plead? Well, more than what they did, because like in paragraph 39, they talk about… Like what? I'm sorry. Like what? In paragraph 39, they say… Like what would you want them to add? I know what they did add, what they said. You say it's not enough. Judge Thompson is asking what should they have added? Something that's concrete that would then tie back into… Like what? What was actually going on at that property. Five minutes remaining. So if they had said such and such who works here contracted COVID, something like that? Well, that would be more. I don't think that would be sufficient, but that would be more than what we have here. Then you would at least have something concrete about the presence of the virus. What would be sufficient? So, you disagree with Judge Barron that that's not a gatekeeping question? Well, there are gatekeeping questions, but it's just not independent of… Let me ask it this way. With respect to the damage claim, is there a way for them to allege, in your view, that virus was present on the property? Is there a way for them to allege that the virus was present? Is there a way for a plaintiff to allege that virus was present on the property that would satisfy you to say, oh, that would be a plausible allegation that virus was present on the property? If there was some connection, it would require an explanation. Okay. Whatever that is, let's say they did that. That would meet your standard for what you would have to allege factually to establish that virus was present on the property. You concede that that's at least possible to do? Yes. Okay. Once that's done, does that satisfy the damage requirement? Only if it's that there's corresponding allegations within the terms of the property. I mean, policy that talk about, you know, period of restoration, that there's repair, rebuild, replacing… No, but that's separate language in the policy. That's not the word damage. That's why he's saying it's a dating question. Doesn't mean they win. Doesn't mean they get recovery under the policy. But just as a legal matter, isn't the damage portion of the policy language satisfied once there are sufficient allegations that virus is present on the property? I don't think there are, Your Honor. Why not? Because of the policy requirements that's baked into the structure of the insuring agreement that talks about the suspension of operations as a result of direct physical loss or damage… Why wouldn't we just construe that language to deal with that problem? Why would we construe the word damage? Precisely because all the other language is there. It would suggest that for the word damage to be doing anything, it must be doing something different. But it all still has to… they still have to have something that's… it's time-limited coverage that is for the business income piece of it, that they can cover their business income only in the situation, because that's what they're seeking here, only in the situation during the period of restoration, which requires repair, rebuilding, replacement of… You're using different policy words. You're not using the word damage, which is the policy word that we're construing. But it all fits together. Well, maybe you win ultimately, but the gating question is, is there damage? If they can't show damage, you never get to repair and restoration. Right. So is presence of the virus alone sufficient to show damage? Why isn't it? It can't be because it's not sufficient to show restoration. Well, there's no allegation in this complaint beyond just the threadbare allegation of damage. There's not any kind of specific… Suppose we thought that the allegation was strong enough to meet the standard you say it needs to be. I realize you think it doesn't. I'm trying to understand why, if it does, is there some reason why presence of the virus inherently can't be damage that's not based on the language about why it can't suffice to show the need for restoration and repair? I guess I'm not trying to say that the presence of a virus of any kind sort of telescoping back out could never, ever cause physical damage. You could conceive of situations where a virus could injure property and cause damage to property in some way. I struggle, though, in the context of the pandemic to think about and see ways that it could happen in sort of this context. Well, they're saying that COVID adheres to surfaces. And when there's that adherence, it's unsafe. It's an unsafe risk for people to be on the property. And they're also saying it remains in the air unless you have proper ventilation, which flushes it out. They make both of those arguments. Your honors are both correct on that, but those are just general mechanisms about how the COVID-19 works. May I complete my comment? Yes, please. Thank you, Your Honor. It's not tied back into how it specifically unfolded at the property, at least as alleged in the complaint. Okay, thank you. Thank you, Mr. Eggert. At this time, please mute your audio and video. And Attorney Foggin, please introduce yourself on the record to begin. Good morning, Your Honors. My name is Laura Foggin. I represent the American Property Casualty Insurance Association as an amicus here. We're talking about the imperative of direct physical loss or damage, which is the central piece of the insuring agreement in these policies. The Sixth Circuit described it as the North Star of commercial property insurance. And it is the essence of how commercial property insurance is built. I just have this hypothetical. I think it would help me if you got into the facts of it. Do you concede that the presence of carbon monoxide in a premises could trigger the language you just described as the North Star of the policy? Your Honor, I don't believe that it necessarily would. No. I didn't ask whether it necessarily would. I asked, do you concede that it could? I don't concede that the presence of… Carbon monoxide. So, and I take it, what about an odor? I don't concede that the presence of an odor… Okay. And smoke? You don't concede that either? Your Honor, the cases that have found that something such as, first of all, they're in a minority, but the cases that have found that something such as an odor or smoke were sufficient to find coverage involved a circumstance where it permeated the actual structure of the building. No, I get that. But I just want to walk through. In the circumstance where a gas is present and it's not visible, and I suppose in the case of carbon monoxide or radon, it's not even detectable by the senses. You need a special thing to detect it, but I sure wouldn't want to go into a place, and I don't imagine you would either if there was a lot of carbon monoxide in it. Do those courts that deal with those type of questions treat that as loss or damage, the presence of the gas? Recognizing you don't accept that they're right, I just would like to know analytically, do they treat that as an instance of loss or damage? Your Honor, I'm not sure that we're in agreement about what the courts have said. I think where the courts have found any coverage involving odor or smoke, it is because the odor or smoke has so permeated the physical building that the building is harmed. That's different from… And that's a damage… …air generally contains a substance where you can open the windows and it will be gone. In that scenario… What do you mean by harmed? So, like, take carbon monoxide. How would you deal with a case in which there's lots of carbon monoxide in the premises? Your thought would be there's no recovery for that. Correct. Open the windows, air out the building, the building has… There are a lot of places that don't have windows. A lot of hospitals have all sorts of interior rooms. All right, we get your argument. Do you have a position, by the way, on the questions we asked about the other two cases? Your Honor, I think there clearly are some similarities among and between the cases, and obviously we defer to the court's views with respect to the extent to which guidance from the Massachusetts Supreme Judicial Court is appropriate. We would submit that this court can and should decide the case because we think it's straightforward. And in that regard, I would like to say that physical presence of the virus is not enough to show direct physical loss of or damage to property. And there are several fallacies in that suggestion. The plaintiffs essentially do try to cause this court to equate the concept of physical presence with actual or physical damage. And their argument is circular. Basically what they say is by virtue of the fact that the virus is present, the property is damaged. But that's just a circular, conclusory statement. There is absolutely nothing that permits this court to draw the reasonable inference of actual harm to property, of physical loss of or damage to property. But that means that you're not including the interior of the building as part of the property. Your Honor, it means that, as Mr. Egbert tried to say, the property itself is the physical structure and the contents of the property. And that is what is insured. The insuring agreement talks about loss to property at the premises. And the policy makes clear that property is something that needs to be rebuilt, repaired, replaced. That is what we're talking about here. We're talking about the physical building itself. And that's why I think those other cases that have talked about it. That's time. In the case of a fire, where you close the property, can they only recover for the physical structure? They can't recover for the loss of the business? In the case of a fire, they can recover for smoke damage, which permeates the building. And they can recover for business income loss, which is caused by direct physical damage to the property burned. Here, we don't have that direct physical damage. We have merely the allegation of presence in a circular conclusory argument that doesn't... So, if it's just smoke, if it's just smoke from a forest, you're saying there's no recovery? Correct, unless the actual physical structure were so permeated with smoke that it could not be removed. You know, with normal cleaning. And what about the risk of... What about the risk of smoke coming in? Right. Risk is not covered, Your Honor. And the policy is pretty clear. And it is a first-party policy that responds to actual physical loss of or damage to property. This isn't a third-party policy where there's a potential for liability. We're talking about, is the property damaged? Has the harm taken place? Is there a need to restore, rebuild, replace, pay for the property? If so, is there a need to, you know, have operations somewhere else? Is there extra expense? Is there some other, because they call this an all-risk policy, is there some other kind of policy that they could have purchased that would have covered what they are claiming in their complaint is a loss? Your Honor, there are lots of different kinds of policies that are written worldwide. There are very few policies that cover communicable disease. However, there have been some very limited communicable disease covers, particularly in Europe, that have been written, you know, tied to particular demonstration of the virus within a certain geographic area or something of that sort. That's not what we have here. This is not a policy that covers, you know, communicable disease. This is a policy that covers actual harm to property. And we don't have that here. One thing I just didn't totally follow, you said about the smoke. If it permeated, do you mean, what did you mean when you said permeated? There's a case, Your Honor, I'm sorry I don't recall the name of it for a second, but it involved gasoline leaking into a building, and the gasoline leaked into the building. The complaint was about the odor of gasoline. And there was a finding of coverage because the gasoline had so permeated the structure that it was now there in the building itself, physically part of the building. The odor? The gasoline, the odor was coming from the building at that point because the gasoline was infused into the floors, the building itself, in a way. There are a bunch of things that caused that. Dead rats in your wall smell for six to eight months. I mean, there are a number of examples of that. On the communicable disease policies, you say they were European. At the time of this coverage, for all risks, were those offered in the American insurance marketplace? Your Honor, I'm not aware of communicable disease coverages at that time being issued in the U.S., but I can't definitively answer the Court's question. I am aware of it having been issued in Europe, which is why I used that particular example. Yes, thank you. That's helpful. Thank you. Okay. Thank you very much. Thank you, Your Honor. That concludes argument in this case. Attorney Renner, Attorney Gilbert, Attorney Eggert, and Attorney Foggin, you should disconnect from the hearing at this time.